No. 15,884.

## THE BOARD OF SCHOOL COMMISSIONERS OF THE CITY OF INDIANAPOLIS *v.* THE STATE, EX REL. SANDER.

SCHOOLS.—*Study of German.—Statute Construed.*—In the act of May 5, 1869, section 4497, R. S. 1881, which provides that "whenever the parents or guardians of twenty-five or more children in attendance at *any school* of a township, town, or city, shall so demand, it shall be the duty of the school trustee, or trustees, of said township, town, or city, to procure efficient teachers, and introduce the German language as a branch of study into such schools," the words "any school" mean any place where a public school is taught, with its complement of teachers and scholars.

SAME.—*Where German Must be Taught When Demand is Made.*—Where, under such statute, the requisite demand is made on the board of school commissioners for the teaching of German in a certain school of a city, the requirement of the statute is not met by providing that the language shall be taught in another school of the city when the pupils have reached a certain grade, but it must be taught in the particular school where the demand is made.

McBRIDE, J., and OLDS, J., dissent.

SAME.—*Refusal to Introduce German Because of Lack of Funds.—Insufficiency of Excuse.*—The board of school commissioners can not set up a lack of funds as an excuse for their refusal to introduce the study of German, where it appears that studies not named in the statute as required studies are taught at an expense greater than would be necessary for the teaching of German.

From the Marion Circuit Court.

*J. S. Duncan* and *C. W. Smith,* for appellant.

*L. B. Swift, W. P. Fishback* and *W. P. Kappes,* for appellee.

MILLER, J.—This was a proceeding by mandate to compel the board of school commissioners of the city of Indianapolis to introduce the German language, as a branch of study, into School No. 22, upon the demand of parents and guardians of children in attendance upon that school.

The action was predicated upon section 4497, R. S. 1881, (Acts of 1869, Sp. Sess., p. 40), which reads as follows:

"The common schools of the State shall be taught in the English language; and the trustees shall provide to have

taught in them orthography, reading, writing, arithmetic, geography, English grammar, physiology, history of the United States, and good behavior, and such other branches of learning and other languages as the advancement of pupils may require, and the trustees from time to time direct. And whenever the parents or guardians of twenty-five or more children in attendance at any school of a township, town, or city shall so demand, it shall be the duty of the school trustee or trustees of said township, town, or city, to procure efficient teachers, and introduce the German language as a branch of study into such schools; and the tuition in said schools shall be without charge: *Provided,* Such demand is made before the teacher for said district is employed."

The verified petition for the alternative writ alleges, in substance, the following facts:

That one of the schools of the city, under the management of said board of school commissioners, is a school known as Public School No. 22; that the school year of the city extends from September in each year to June of the following year; that before any teachers for said school were procured or employed for the coming year the parents and guardians of one hundred and twelve children in attendance at said school petitioned and demanded of the appellant board that it procure and employ efficient teachers and introduce the German language as a branch of study into said school for the coming school year; that said board refused to grant said demand, but went on and employed teachers to teach all the other branches required by law in said school and still other branches not required by law, but all the time refused to provide for teaching the German language in said school. The petition to the board was set out in full with the names of the children and wards. This suit was begun June 21st, 1890.

To this the appellants answered: That, prior to the filing of the demand for the teaching of German, said board, having considered the grading of the Indianapolis schools and

the course of instruction therein, and the teaching of German therein, and the employment of teachers therefor, and what branches required by the advancement of pupils should be taught in addition to the statutory branches, all in connection with the revenues, had determined that German should be taught, and could be efficiently taught, for the last seven years of the twelve years' course of said Indianapolis schools; that the revenues of the board would not permit the teaching of German to a greater extent, and the board had determined to employ teachers for the last seven years of the course; that the board had graded the schools; that it had erected buildings in various parts of the city convenient of access to pupils, and had so arranged that pupils in lower grades could attend school nearer home, while those in higher grades, being older and fewer in number, attended at buildings more remotely located; that the number of pupils attending in the last seven years of the course was 5,346, and would be greater the coming year; that the estimated revenue for the coming year would be $252,973, of which amount $210,000 would be required for tuition under the present plan of the board; that public school building No. 22 had been erected upon these principles, and that for many years no pupils advanced beyond the fifth year of the school course have attended or been taught at said school building; that none of the pupils mentioned in the petition for teaching German in said school No. 22 have advanced to the sixth grade, and, therefore, they are not entitled to enter classes where German is taught; that as soon as said pupils reach the sixth year they will go to buildings where German is taught, and may there study it; that, with the revenue at command, there is no other feasible method of grading the schools of Indianapolis.

To this answer the appellee replied: That for many years the city has been subdivided for general school purposes by the board by erecting school buildings throughout the city, to which children living near have been assigned for at-

tendance according to the grades taught; that, whatever have been the grades taught, it has been the custom of parents and guardians to file petitions for the teaching of German like the petition filed with the complaint for the teaching of German in public school No. 22; that the board has complied with said petitions and has introduced the German language accordingly; that until the recent refusal of the board, it was supposed by the community that it would continue such compliance; that at a meeting of the board in June, 1890, it had on motion refused to provide for any teaching of the German language in any of the schools of said city during the coming school year; that two thousand children desired to study the German language, but under the plan of the board, as described in the answer, only three hundred of these could do so; that the board, while refusing to provide for teaching the German language, proposed to provide for teaching the following branches not required by law, at an expense out of the school revenues, as follows:

| | |
|---|---:|
| Music | $13,000 |
| Drawing | 16,000 |
| Manual training | 1,300 |
| Physical training | 3,000 |
| Chemistry | 1,000 |
| Physics | 2,000 |
| Greek | —— |
| Bookkeeping | 500 |
| Geometry | 1,000 |
| English literature | 2,000 |
| General history | 500 |
| Algebra | 3,000 |
| Latin | 1,000 |
| Training school for teachers | 1,500 |
| Civil government | 800 |
| Rhetoric | 2,000 |
| Botany | 500 |

That physical training is a new branch of study which the board intends to introduce for the coming school year; that, if the teaching of the German were provided for by the board wherever demands like the one in the complaint have been made, the same would cost not to exceed $10,000 for the coming school year; that the number of pupils in the grades comprising the first five years of the schools during the past year was 11,941, and will be greater during the coming year.

To this reply the appellants demurred for want of facts; the demurrer was overruled and exception taken. After trial a judgment was entered directing the mandamus to issue. The appellants appealed, and the only error assigned is that the court erred in overruling the demurrer to the reply.

The claim is made by the appellee that the only question presented by the record is as to the power of the appellants, in their discretion, to refuse to introduce the study of the German language into any of the public schools of the city, notwithstanding the filing of a proper petition therefor by the requisite number of parents and guardians. This claim is founded upon the allegation in the reply that at the meeting of the board held in June, 1890, a motion providing for the teaching of German in all the schools of the city, in which proper petitions were filed for the same, was voted down, and a motion made to provide for the teaching of the language as set forth in the defendants' answer was not finally acted upon, followed by the averment that "said defendants have refused to provide for any teaching of the German language in any of the schools of said city during the coming school year." The appellee insists that the reply shows that the appellants refused to comply in any manner with the mandate of the statute to introduce the language as a study into the public schools, and that, therefore, the court did not err in overruling the demurrer to the same.

To give the language quoted the force and effect claimed for it by the appellee would be to eliminate from the case the

only question about which the parties litigant disagree ; for the appellants admit, that, upon the filing of a petition by the parents and guardians of the requisite number of children, the statutes imperatively require the language to be taught in the schools.

The answer to which this reply was filed alleges that in May, 1890, the board determined to provide for the teaching of German in some of the grades and schools in the city, and that they would do so without any order of the court.

The meeting of the board at which the motion to employ teachers, and provide for the introduction of the language into the public schools, was held in June. This action was commenced in the same month, and the reply filed on the 11th of July ; the schools were not to begin until September following. There is no express negation of the facts alleged in the answer, that the board intended to make provision for German in the schools before the opening of the school year.

We understand the allegation of the reply referred to, when read in connection with the answer, to mean that the board had, at that meeting, refused to provide for its introduction, and not that they would not do so prior to the opening of the schools in September, in the manner determined upon at their May meeting.

The purpose of the action was to compel the defendants to introduce the study into a particular school ; all the allegations of the petition for a mandate referred to that school ; the theory of the relator confined him to that position. The judgment of the court was in accordance with that theory, and by it the defendants were commanded to employ efficient teachers, and introduce the language as a branch of study into that particular school, no order being made with reference to the other schools in the city.

This case is to be determined by the answer to the question : What did the General Assembly mean by the use of the words " any school," when it said, in the act approved

May 5, 1869 : " And whenever the parents or guardians of twenty-five, or more, children in attendance at any school of a township, town, or city, shall so demand, it shall be the duty of the school trustee, or trustees, of said township, town, or city, to procure efficient teachers and introduce the German language as a branch of study into such schools."

The position of the appellee is that the parents and guardians of more than twenty-five pupils in attendance upon Public School No. 22 having, at the proper time, filed the requisite petition, it became the duty of the Board of School Commissioners to provide for its teaching in that particular school, no matter what arrangements may have been made to have it taught in other schools, and to other scholars.

The position of the appellants is, that, while the filing of the petition makes it incumbent upon the board to have the language taught in the schools of the city, they may, in their discretion, determine in what schools, to what grades of pupils, and for what length of time it shall be taught; and that when they have provided for its teaching in some of the schools of the city, convenient of access to the grades to which the language is assigned, they have fully complied with the law, and can not be compelled to have it taught in Public School No. 22.

In arriving at a correct solution of the question involved, it is instructive to note, in a general way, the origin and growth of legislation upon the subject under consideration.

For many years prior and subsequent to the adoption of our present Constitution, the selection of teachers and designation of the studies to be taught in the public schools were under the exclusive control of school meetings, composed of the patrons of each school. The first legislative recognition of specific studies was in the act of March 4th, 1853, which provided that no persons should be licensed to teach in the public schools unless they possessed " a knowledge of orthography, reading, writing, geography, English grammar."

In section 150 of the act of 1855, which is the rudiment

of the section under which this action was brought, it was enacted that:

" The common schools shall be taught in the English language: *Provided, however,* That schools may teach other languages, in addition to the English, as a branch of education."

In the act of March 6, 1865, it was provided that " The common schools of the State shall be taught in the English language, and the trustee shall provide to have taught in them orthography, reading, writing, geography, arithmetic, English grammar, and good behavior, and such other branches of learning, and other languages, as the advancement of pupils may require, and the trustee from time to time direct; and the tuition in said schools shall be without charge."

This remained the law until the act of May 5, 1869, *supra*, was enacted.

The first question is, omitting for the present all consideration of the effect of subsequent legislation, to determine if possible the legislative intent in the enactment of this amendment of May 5, 1869, in which, after adding physiology and history of the United States to the required studies, the conditional provision was made for the teaching of the German language.

The act of 1865, which was amended, required seven named branches of learning to be taught, and other studies and languages at the option of the school trustees. It was under that act within the power of the school trustees, if they so desired, to have physiology, history of the United States, and the German language taught in the public schools. The object of the amendment was to compel the teaching of physiology and history of the United States, and to withdraw the German language from the list of purely optional languages that might be taught at the discretion of the trustees, and place it conditionally in the list of required studies. By this legislation the law-making power discrim-

inates in an emphatic manner in favor of the teaching of the German over that of any other language. This amendment was doubtless brought about by the fact that we had then, as now, a large population speaking the German language who desired that their children should receive instruction in that language.

Taking into consideration the course of legislation, and the circumstances under which it was enacted, we are, if possible, to determine from the reading of the act in what schools the Legislature intended the language should be taught.

The rule of construction to be adopted is provided by statute and is as follows. Section 240, R. S. 1881: "The construction of all statutes of this State shall be by the following rules, unless such construction be plainly repugnant to the intent of the Legislature or of the context of the same statute: ·

"First. Words and phrases shall be taken in their plain, or ordinary and usual sense. But technical words and phrases, having a peculiar and appropriate meaning in law, shall be understood according to their technical import."

As the words used in the act under consideration do not contain technical words or phrases, relating to the disputed question, having a peculiar meaning in law, we must take the words used in their "plain, ordinary and usual sense." In townships, towns and cities, in which but a single school is taught, the solution of the question is easy. The trouble arises in towns and cities in which the schools are taught in many school-houses, placed in different localities, the whole being under one management and control.

While the question may not be entirely free from doubt, we have arrived at the conclusion that the words "any school," as used in this statute, mean and designate any place where a public school is taught with its complement of teachers and scholars. Such we believe to be the ordinary and usual meaning of the word school, and that this con-

struction is necessary to give effect to the object intended in its enactment. Such, indeed, seems from the reply to have been the construction placed upon the act by the appellants and their predecessors in control of the city schools for many years prior to the year 1890.

By the terms of this act the introduction of no other study into the public schools is made to depend upon the demand or request of the patrons of the school, but on the contrary it has been the evident design of the Legislature to establish, as far as possible, a uniform course of study throughout the whole State.

We take it that the exception to this course of legislation was, primarily, for the benefit of parents and guardians who desired their children and wards to receive instruction in this language, and that a construction that would defeat this purpose ought not to be entertained, if it can be avoided. We are of the opinion that the Legislature contemplated that the parents and guardians of the children in attendance upon a school, who would demand the introduction of the German language, would do so for the purpose of enabling their children and wards to engage in its study, and not for the purpose of enabling some other children and other wards of another grade, and in attendance upon a school, taught in some other school, to receive such instruction.

In this case the parents and guardians of one hundred and twelve pupils in attendance upon Public School No. 22 asked to have the German language taught in that school, with the undoubted motive of having their children and wards engage in its study. In answer to this request the appellants say, in effect, we will not have this language taught in this school, and to your children and wards attending it, but will introduce the study in some other school, in some other part of the city, and to some other pupils. We regard this as a strained and unnatural construction of the words of the act, utterly subversive of the purpose of its enactment.

If the position of the appellants is the correct one, a peti-

tion by the parents and guardians of twenty-five pupils in attendance upon any one of the many public schools in the city of Indianapolis will cause the introduction of the German language into the schools of the city as effectually and fully as if it had been petitioned for in each school by the requisite number of parents and guardians. We need not characterize a construction that leads to such a result.

Four years after the passage of this act providing for the introduction of German into the public schools, when petitioned for, the Legislature passed the act of March 3, 1871, which is in force only in the city of Indianapolis.

By this act the control of the public schools, which prior to that time had devolved upon the school trustees, was transferred to the board of school commissioners. Among the other duties of their office they were authorized:

"*First.* To district the city for the purpose of electing school commissioners therein, and also to subdivide the city for general school purposes. ·

"*Seventh.* To establish and enforce regulations for the grading of and course of instruction in the schools of the city, and for the government and discipline of such schools." Section 4460, R. S. 1881.

Section 8 of this act (section 4463, R. S. 1881) continues in force within the city all of the general school laws of the State which are not inconsistent with the provisions of this act.

Among the general provisions of the school law thus continued in force is the following:

"The persons listed in each of such towns and cities shall be considered as forming but single school districts therein, distinct from the townships in which they are situate."

It is earnestly contended by the appellants that, inasmuch as all the schools of a town or city form but a single school district, in which the school commissioners may assign the pupils to such school as they choose; and as they are given authority, in their discretion, to "establish and enforce reg-

ulations for the grading of and course of instruction in the schools of the city," they may determine in what schools,. and to what grades of the pupils the German language may be taught. We do not think that the act of 1871 either repeals or modifies the section of the act of 1869, under consideration. In fact we do not regard the provision authorizing the grading of the pupils as greatly enlarging the authority of the school officers in that respect. The power of the school commissioners to establish and enforce regulations for grading the schools, and regulating the course of study, must be exercised subject to the dominant law of the State. The grant of a power which is a mere permission, not a command, to grade the schools or establish a course of study can not be held to authorize the school commissioner to disregard a positive and specific law of the State.

While the city of Indianapolis does, for the purpose of the enumeration and listing of school children, and for many other purposes, constitute a single school district, it can hardly be said to have but one school. The mere statement of the proposition would seem to be sufficient. The act of 1871 authorizes the school commissioners to subdivide the city for general school purposes. The pleadings show that they have subdivided the city for school purposes, and erected school buildings in different parts of the city, and assigned pupils to, and numbered them as different schools. This makes them as effectually and distinctly different schools as those in a country township.

The appellants say in their answer that they have considered the subject of the study of German in connection with their resources, and that with their available resources they can not provide for the teaching of German for any greater length of time than seven years out of the twelve-year course.

We are of the opinion that the allegations contained in the answer showing want of funds are fully met by the reply. The answer shows that the appellants had on hands,

unappropriated, over $40,000 more than would be required for tuition upon the system of grading and plan of employment of teachers as adopted by the board. The reply says that it will cost only $10,000 to provide for instruction in the German language wherever demanded. This is a complete reply to this portion of the answer. But the reply goes further and shows that in the estimated expense of running the schools, as set forth in the answer, there is included a sum in excess of $60,000 for teaching music, drawing, manual training, physical training, chemistry, physics, Greek, bookkeeping, geometry, English literature, general history, algebra, Latin, training school for teachers, civil government, rhetoric, and botany. None of these studies are named in the statute as required studies, but their teaching is provided for under the general direction for the teaching of "such other branches of learning and other languages as the advancement of pupils may require and the trustees from time to time direct." Under this statute we hold that it is incumbent upon the school authorities to provide for the teaching of those studies that are expressly named and provided for, and that they can not appropriate the school funds for the teaching of optional studies, and then say that they can not comply with the requirements of the statute for want of funds.

We do not desire that this construction of this section of the statute shall be understood as a curtailment of the enlarged discretion given the board of school commissioners in the control, grading and management of the public schools, except in so far as it may be necessary to give full force and effect to the legislative enactment.

The board of school commissioners is a *quasi* corporation, possessing, by necessary implication, such powers as are or may be necessary to carry out the purpose for which it was created; but these powers must be exercised subject to the paramount laws of the State. With reference to the act under consideration, we are of the opinion that when the requi-

site demand is made it becomes the duty of the board of school commissioners to introduce the German language as a study into the particular school where it is demanded, and that upon their refusal they may be compelled by mandate to act in the matter ; that they have no discretion to refuse, but must act. When they have introduced the study, they are, while acting in good faith, and in the reasonable discharge of their official duties, the exclusive judges of the manner in which it is taught, and the extent to which it shall be studied, whether, for instance, by the teachers in charge of that school, or by some other efficient teacher, who gives instruction in a number of schools.

They are the judges who are to decide how much, or how little, instruction is given, provided it be taught simply as a branch of study. The statute says, in a manner so positive and emphatic that it can not be misunderstood, that the common schools of the State shall be taught in the English language, and any board of trustees, or school commissioners, or other school officer, who, under guise of the provisions of this act, should have a school taught in the German language, would be guilty of misappropriating the school funds, and become liable therefor on his official bond.

We are met by the argument that by this construction the German language, as a study, has an advantage over every other study, and that to do so is inexpedient and unjust. We did not enact this statute, and it is no part of our duty to pass upon its expediency. That was for the Legislature. Our duty is to construe, not to criticise.

We are not, however, apprehensive that the fears expressed in argument will be realized. We have no doubt but that the board of school commissioners, in its wisdom, will be able to devise means by which the law will be carried out in good faith, without serious interference with the grading of the schools.

We are, in this case, not called upon to decide, and do not decide, that the language shall be taught in each school

room, and it would be improper to express an opinion upon that subject. Neither can we judicially take notice that the German language may not, like good behavior, which is one of the required studies, or like music or physical training, which are optional ones, be taught in any grade without interference with other studies.

In our opinion the court did not err in overruling the demurrer to the reply.

Judgment affirmed.

Filed June 23, 1891.                    •

### DISSENTING OPINION.

McBRIDE, J.—In my opinion a fair statement of the precise question involved and decided in this case is as follows:

The necessary preliminary steps having been taken, the German language was introduced as a branch of study in the schools of the city of Indianapolis. The board of school commissioners of the city (corresponding to the board of school trustees of other cities and towns in the State), assuming that this branch of study was thereafter to be dealt with precisely as any one of the other nine required branches, graded the schools accordingly, and assigned it its place in the course of study, as they assigned a place to English grammar, to arithmetic, and to other branches. By the course of study thus fixed, the study of the German language commenced with the beginning of the sixth year, and continued thereafter during the remaining seven years of the course.

None of the pupils in school No. 22 were advanced beyond the fifth year, and were consequently not sufficiently advanced to be assigned to the grades in which German was taught.

The answer, or return, to the alternative writ of mandate avers that the board had taken under consideration the subject of teaching the German language, and had decided that " the last seven years of the course of instruction was the period in which the German language, as a branch of study,

could be most efficiently taught, with the means under the control of said board of school commissioners ; * * * that it is the intention, and has at all times been the intention, of said board of school commissioners to provide for the efficient teaching of the German language as a branch of study for all pupils attending the schools of said city, who have advanced in their studies to the beginning of the sixth year of the course of instruction, and to provide efficient teachers to that end ; * * * that as soon as said pupils " (in school No. 22) " have advanced to the beginning of the sixth year in the course of instruction, as prescribed by the board of school commissioners, and thus entitled to be admitted to classes, or grades, wherein the German language is taught, they will be admitted into such grades in other buildings in which such grades and the German language are taught, which buildings have been provided convenient of access to such pupils."

These facts do not seem to be controverted. The appellee, in this case, assuming that the board had no discretion in the matter, as to that study, at least, but must provide for teaching it in that particular school, and to that particular grade, regardless of the system of grading and course of study, and regardless of the age and acquirements of the pupils attending there, brought this suit to compel them to break up their system of grading and teach the German language to the particular pupils who were instructed in school No. 22. The contention of the appellee can not be sustained without adjudging that, while the Legislature has assumed to intrust the management of the schools of the city to certain officers elected by the people because of their assumed fitness, and acting under the sanction of an official oath, and has said in express terms that they are authorized " to establish and enforce regulations for the grading of, and course of instruction in, the city," as to at least one study, they have given these officers no independent authority whatever ; and although their deliberate judgment may be that the best in-

The Board of School Comm'rs of Indianapolis *v.* The State, *ex rel.* Sander.

terests of the schools require the teaching of that study only to certain grades, and to pupils who have reached a certain degree of proficiency, they may be compelled, by the strong arm of the courts, to change the course of study at the demand of persons who are charged with no duty or responsibility, and who, while they may be as well, or better, informed and qualified to pass on such questions as the members of the board, may, on the other hand, know as little of the management of schools as a babe does of logarithms.

With all due respect to my associates, this is a fair statement of the interpretation given to the law by the majority opinion herein, after giving due weight to every attempted limitation.  Indeed, by every rule of logic, notwithstanding the attempt to limit the question decided, it goes much further, and, as I will hereafter show, undermines every vestige of authority to grade, and to establish and maintain any systematic course of instruction in graded schools.

Counsel for appellee, in their brief, denounce the power which the Legislature has intrusted to school officers to grade schools, and regulate their course of study, as "the pretended bulwark behind which the pedagogic martinet exercises his petty tyranny, and school boards here and there carry a high and unlawful hand."

The decision of this case leaves but little, if anything, remaining of that "bulwark," although under its shelter the public schools of Indiana have reached a degree of efficiency second to the schools of no other State, and of which the people of the State are justly proud.

It involves the determination of questions of the highest importance to the people of the State, not because it is of special importance to the people generally what is done in school No. 22, in the city of Indianapolis, but because its decision involves the determination of principles which can not be confined in their application to school No. 22 ; nor alone to the schools of that city, but reach and affect every graded school in the State.   If the effect of the opinion of

the majority of the court could be limited to that particular school, or even to that city, I would hardly feel justified in dissenting. But in this country few questions concern more nearly the common interests of all the people than those affecting our common school system, and anything, the tendency of which is to impair its efficiency, or seriously impair any of its essential features, demands earnest protest, and opposition, from all who are placed where they may be held responsible therefor.

The law gives to the school officers of every school corporation in the State authority to establish and maintain graded schools. The powers thus conferred upon school corporations, outside of the city of Indianapolis, do not differ in any material particular from those possessed by the school corporation of that city. At all events it will not be claimed that less extensive powers are conferred upon that city than upon other cities and towns in the State.

The statute prescribing the studies which shall be taught is precisely the same as applies to all the public schools of the State. That which the board of school commissioners of Indianapolis may be compelled to do by mandate, by way of changing its course of study, and system of grading, the board of school trustees of every city and town in the State may be compelled to do.

It may be well to consider first, the nature of the power conferred upon school officers, where they are authorized to establish and maintain graded schools.

What is a graded school? The Century Dictionary defines it: " A school divided into departments, taught by different teachers, in which the children pass from the lower departments to the higher as they advance in education."

At page 225 of the Annual Report for 1877, of the United States Commissioners of Education, such a school is defined as " an arrangement of the pupils according to their ages and capacity to study certain things." The establishment and maintenance of a graded school, therefore, involves not only

the grading of the pupils, according to age, capacity, or acquirement, but the adoption of a course of study, and of rules for the advancement of pupils from grade to grade as they advance in acquirement.

The nature and extent of the power possessed by school officers to direct and control the course of study in the schools in their charge have been many times considered by this court, and the courts of other States.

The case of *State, ex rel.,* v. *Webber,* 108 Ind. 31, was a case involving the power of the school board to add music to the list of prescribed studies, and to suspend from the school those who refused to pursue that study. The court held that the making of a rule of that character was an exercise of the discretionary power possessed by the board, and denied mandamus to compel the admission of a pupil suspended for refusal to comply with it. In the course of the opinion the court said :

" It was competent, we think, for the trustees of the school city of La Porte to enact necessary and reasonable rules for the government of the pupils of its high school, directing what branches of learning such pupils should pursue, and regulating the time to be given to any particular study, and prescribing what book or books should be used therein. * * * The power to establish graded schools carries with it, of course, the power to establish and enforce such reasonable rules as may seem necessary to the trustees in their discretion, for the government and discipline of such schools, and prescribing the course of instruction therein. * * *

" Where such trustees may have established a system of graded schools, or such modifications of them as may be practicable, within their respective corporations, they are clothed by law with the discretionary power to prescribe the course of instruction, in the different grades of their public schools. * * * The important question arises, which should govern the public high school of the city of La Porte, as to the branches of learning to be taught and the course of instruc-

tion therein, the school trustees of such city, to whom the law has confided the direction of these matters, or the mere arbitrary will of the relator, without cause or reason in its support? We are of the opinion that only one answer can or ought to be given to this question. The arbitrary wishes of the relator, in the premises, must yield and be subordinated to the governing authorities of the school city of La Porte, and their reasonable rules and regulations for the government of the pupils of its high school."

Upon the question of the discretionary power possessed by the school officers in the management of the schools placed in their charge, the authorities overwhelmingly support the doctrine above laid down.

In *Guernsey* v. *Pitkin*, 32 Vermont, 224, the following language is used by Redfield, C. J.:

" But in regard to those branches which are required to be taught in the public schools, the prudential committee and the teachers must of necessity have some discretion as to the order of teaching them, the pupils who shall be allowed to pursue them, and the mode in which they shall be taught. If this were not so, it would be impossible to classify the pupils."

In *Ferriter* v. *Tyler*, 48 Vermont, 444, the court says: "It stands out so plain as not to be matter for debate, even if it be not expressly conceded, that schools, in order to realize the intent of the Constitution in their behalf, must be subjected to system and order under established rules."

In *Donahoe* v. *Richards*, 38 Maine, 379, it is said: "If the right to direct the course of instruction and the books to be used is given, the right to enforce obedience to the determining power must manifestly exist, or the determination will be ineffectual. It would be worse than idle to grant this power to direct, if any one can set at naught the action of the committee."

In *Roberts* v. *City of Boston*, 5 Cushing, 198, it is said : " The power of general superintendence vests a plenary authority in the committee to arrange, classify, and distribute pupils, in such a manner as they think best adapted to their general proficiency and welfare."

In *Hodgkins* v. *Inhabitants of Rockport*, 105 Mass. 475, the Supreme Court of Massachusetts says of a statute which says that school officers " shall have the general charge and superintendence of all the public schools in town," that " This general power, by necessary implication, includes the power to make all reasonable rules and regulations for the discipline, government and management of the schools."

To the same effect are the cases of *Sewell* v. *Board*, etc., 29 Ohio St. 89 ; *Fertich* v. *Michener*, 111 Ind. 472 ; *King* v. *Jefferson City*, etc., 71 Mo. 628 (36 Am. Rep. 499), and many other cases that might be cited.

The case of *.Trustees*, etc., v. *People, ex rel.*, 87 Ill. 303 (29 Am. Rep. 55) is one of a line of cases opposing the principle laid down in *State, ex rel.*, v. *Webber, supra*, in so far as affects the right of the parent to elect what studies in the prescribed course may, and what may not, be pursued by his child, it being there held that the parent may thus elect.    To the same effect is *Morrow* v. *Wood*, 35 Wis. 59 (which is probably the leading case taking that view) ; *Rulison* v. *Post*, 79 Ill. 567, and some other cases.    These cases, however, while holding that a pupil can not be compelled to pursue a certain study against the will of the parent, expressly recognize and declare the right to classify and grade, and that there can be no interference by the parent with that right.    While the parent may say that his child shall not be required to pursue certain studies, as to such studies as the child does pursue he. must conform to the established rules, and must take them in the order in the classes, and in the manner prescribed by the school officers.

In *Trustees*, etc., v. *People, ex rel., supra*, it is said : " Under the power to prescribe necessary rules and regulations

for the management and government of the school, they may, undoubtedly, require classification of the pupils with respect to the branches of study they are respectively pursuing, and with respect to proficiency or degree of advancement in the same branches. * * * All regulations or rules to these ends are for the benefit of all, and presumptively promotive of the interests of all. No parent has the right to demand that the interests of the children of others shall be sacrificed for the interests of his child ; and he can not, consequently, insist that his child shall be placed or kept in particular classes, when by so doing others will be retarded in the advancement they would otherwise make ; or that his child shall be taught studies not in the prescribed course of the school. * * * * The rights of each are to be enjoyed and exercised only with reference to the equal rights of all others." And in *Morrow* v. *Wood, supra,* it is expressly stated that " The parent did not propose to interfere with the gradation or classification of the school, or with any of its rules and regulations, further than to assert his right to direct what studies his boy should pursue that winter ;" that is, that he should be allowed to omit a certain study, and thus stay out of certain of the established classes. If the opinion of the majority of the court, in this case, should stand as declaratory of the law, it will be unique, as being the first and only case under a statute which confers on school officers general power over, and control of, the public schools to declare the rights of the parent, instead of the school officer, to control the gradation and classification of the pupils. It is against all the authorities, and in principle expressly overrules *State, ex rel.,* v. *Webber, supra.*

Power to establish and maintain graded schools has been possessed by the school officers of this State for more than thirty-five years, the act of March 5th, 1855, 1 G. & H. 542, containing this provision, section 8 : * * * " They may also establish graded schools, or such modifications of them as may be practicable."

The act of March 6th, 1865, 1 Davis Stat. 778, contains the following: "Section 10. The trustees shall take charge of the educational affairs of their respective townships, towns and cities. * * * * They may, also, establish graded schools, or such modifications of them as may be practicable; and provide for admission into the higher departments of the graded school, from the primary schools of their townships, such pupils as are sufficiently advanced for such admission."

The law which authorizes the establishment of graded schools, by necessary implication carries with it the power to establish and enforce all necessary and reasonable regulations for grading such schools, and for establishing a course of instruction therein; to assign to each study its place in the course, and to prescribe reasonable rules for the progression of pupils from grade to grade.

In addition to this, the act of March 3d, 1871, confers express authority in the following terms: "To establish and enforce regulations for the grading of and course of instruction in the schools of the city, and for the government and discipline of such schools." Section 4460, clause 7, R. S. 1881.

The statute authorizing the introduction of the German language, as a branch of study, was enacted May 5th, 1869. It declares, in express terms, that when introduced, it is "as a branch of study." Section 4497, R. S. 1881.

This was necessarily done in view of existing laws authorizing the establishment of graded schools, with the attendant power to regulate the course of study, assigning to each branch of study its appropriate place. As a branch of study it is, like the other branches of study, prescribed by the same act, subject to similar regulation by the school officers. To hold otherwise would be to hold that by the act of May 5th, 1869, there was an implied repeal of the statute giving power to grade to school officers, in so far as this one branch of study is concerned. It is, of course, too well settled to require citation of authorities, that repeals by implication are not fa-

vored, and that the two statutes must, if possible, be construed *in pari materia*, so that full force and effect can be given to each. Again : By what rule of construction can it be said that when the Legislature, two years later, conferred power to establish regulations for the grading and course of instruction in the schools of the city, it intended to and did except one branch, and deny to the school board any control over it ? Indeed, as I understand the position and argument of appellee's counsel, it is that the duty is imperative to provide for the teaching of all of the studies prescribed by the statute, in each grade.

In this they are, at least, logical, and if they are right, the power to grade schools and establish a course of study is reduced to a very attenuated shadow, as each person whose children are attending a given school, who wishes them to be taught in any one of the required studies placed in grades in advance of that to which they belong, can compel a change in the course of study for his accommodation. The separate and individual opinion or caprice of the parents will be substituted for the judgment of the officer, while order and system in the school-room will give place to anarchy.

The attempt to limit the application of the principle declared to the one study is ineffectual. It is made to turn on a question of verbal criticism, by which process the conclusion is reached that by the words " any school," as used in section 4497, *supra*, is meant the particular building, or room, with its complement of teachers, pupils, etc., which chances at the time to be occupied by the pupils whose parents have presented the petition, whether the building contains those belonging to only one out of many grades, or, like the ordinary district school, contains those of all grades in one room.

The further conclusion is also reached that school No. 22, although shown to contain only certain pupils belonging to certain of the lower grades in the city school system, is a

separate and distinct school within the meaning of the law. This process of examination of the statute is entirely too microscopic to afford a solution to the problem. The Legislature, in the enactment of this law, was prescribing a general rule intended to govern all the schools of the State. In perhaps the majority of the towns of the State one large building, containing many rooms, accommodates all the grades; the pupils starting in the primary room, and passing in turn from room to room, as they pass from grade to grade. Suppose, while we find this condition existing in a given town, that in a neighboring town we find, instead of one large building, many small ones, each separate from the others, each with its complement of teachers and pupils, but each accommodating a single grade. With promotion, its pupils pass from building to building as they pass from grade to grade. By the rule of construction thus adopted one town has a single school, and the other has many schools. In the town with the single large building, the parents of twenty-five children attending that school can, upon petition, have the German language introduced as a branch of study; while in the other, although the parents of many times that number petition for it, unless at least twenty-five of them are in one of the buildings they can not have it. If the requisite number of children are found only in one of the buildings, they can have the study introduced into that building and grade, and into none of the others. Did the Legislature intend any such thing? It was evidently the intention that a much broader view should be taken. The child, when it enters a graded school, does not enter it with a view to completing its education in a single grade, but expecting that, as intellect develops, and additional acquirement comes, it shall pass from grade to grade, from room to room; or, if you please, from school to school. It is, of course, unfortunate that many pupils are unable to complete the course, and in that way are deprived of the instruction which can only be given to them in the later years of the course. For this no remedy can

be devised. It is true of all studies which in the course prescribed, lie beyond the point where they drop out. Under any system of grading which will give time for efficient instruction, some studies must wait while others are being taken. To require children of primary grades to pursue simultaneously all of the required studies, would be to impose on their untrained intellects an unreasonable and unjustifiable tax. It is upon this that all systems of grading are based, with a view to the gradual development and unfolding of the child's mental powers. There can be no forcing of this development. The task of devising the best means of accomplishing this end the law has intrusted to the school board.

It was undoubtedly the legislative purpose in authorizing the introduction of this branch of study, to give opportunity to acquire a practical knowledge of it. How could this be accomplished, if, when it was petitioned for by the requisite number of persons, it was not thereupon to be placed in the course with other studies and provision made for continued and progressive instruction in it? In this case is it expected that the pupils in school No. 22 will acquire a practical knowledge of that study in the brief time they will remain in that grade? It is manifest that in that short time they could at best acquire but a slight and superficial knowledge of the rudiments of the language, which could be of no practical value whatever. We can not think that this is what the Legislature had in view.

In the course of instruction prescribed by the appellants, seven years are devoted to that study; that is, the course of instruction in that study extends over that time. When the parents of school No. 22 asked to have it introduced in that room, did they expect that when, in a few months, promotion carried their children to other grades, instruction in that language would end? When the Legislature provided for the admission of that study into schools, on petition, it certainly meant that it should come in as a branch of study,

not in a given grade, but in the school, viewing the school as an entirety from the time the pupil entered it until he left. It certainly meant to leave the question as to when and where it could be most efficiently taught, to the officers intrusted with the management of the schools, as they intrusted to them similar discretion with reference to all other studies. And when these officers show the adoption of a plan providing for the thorough teaching of this study to all the school children as soon as they reach a certain grade,. and that to this end they have provided buildings convenient of access to all, is it just or fair to characterize this as a proposition to teach the study only to some other children in some other part of the city?

Much false reasoning in this case comes from considering it as a question of adding a *particular* study to the course instead of adding an *additional* study.

Suppose this statute, instead of providing for the introduction of the German language, provided for the introduction, in precisely the same manner, of some of the higher branches of mathematics. Strike out the words " German language " and insert instead " algebra " or " trigonometry " or "geometry." Would any one seriously insist that the Legislature meant that when a petition was presented by the requisite number of persons for its introduction as a branch of study, the board would not only be required to admit it, but might, on demand, be compelled to provide for teaching it to the primary grades?

Suppose the last Legislature had amended the law by additional proviso, in precisely the same words, except that it had called for the introduction of the Hebrew language. A large, intelligent and useful class of our citizens would have special interest in such a law. Indeed, the great mass of our people, believing that the Hebrew scriptures are the word of God, would have special interest in such a law. If the reasoning in the opinion of the majority of the court is. sound, the board of school commissioners would not only

be compelled to admit it as a branch of study, but would be powerless to determine when in the course of study it should be taught, and might, on demand, be compelled to provide for teaching it in the primary grades. All the reasoning, as applied to the German language, would apply with equal force to the Hebrew language, or to the Italian, or French, or the language of Sweden.

I do not question the power of the Legislature to limit the control of school officers in the management of the schools. It has created these officers and conferred such powers as they have. Notwithstanding the fact that time has demonstrated the wisdom of their course, and that the large measure of discretion vested in those officers has been a potent factor in the magnificent development of our school system, the power which created can destroy them, or may in any manner curtail their power.

It is not here a question of legislative power, but the construction of a legislative act. Although, indeed, if one interpretation given to this act by counsel for appellee, in argument, could be correct, there might be a question of legislative power. I refer to the construction which would view this law as enacted for the benefit of Germans.

As a branch of study there can be no objection to the introduction of the German language into our schools. It is a noble language of a great people. It is not only commercially advantageous to our children to be able to use it, but it introduces them to a literature singularly rich and strong. But neither Germans, French, English, nor those of any other foreign nationality can, as such, have any rights in our public schools, and any legislation, attempting to recognize or confer any such right would be void.

Our Constitution, providing for a system of common schools, contemplates a school system for the education of the children of American citizens only, and such an education as will fit them for the duties of American citizenship. That which has made the German immigrant so welcome an addi-

tion to our population is the readiness with which he becomes Americanized, and the sincerity of his devotion to his adopted country has been sealed on many battle fields. As American citizens, their rights in our common schools are the same as if they were native born. But the doors of the common school can only legally open to those of foreign blood when they renounce their alien allegiance, and pledge fidelity to the United States. I can not think that the Legislature intended by this action to introduce the race question into our schools, or to recognize the principle that any other key than that of American citizenship should, under any pretence, open the school-house door. Sound public policy demands the emphatic declaration that in this country and under our flag there is room for but one nationality, where all have common interests and should have one common language.

In my opinion the German language is, by virtue of the petition presented, and the demand made, one of the required studies in the city of Indianapolis, but that as such it stands upon precisely the same footing as all the other required studies, and should be given its proper place and fair proportion of the time in the course of instruction; that, while the board of school commissioners could be compelled by mandate to admit it to the course, if they refused, their discretion could not, and can not, be further controlled.

Mandate will not lie to control or direct the exercise of a discretionary power by a public officer. *State, ex rel.,*v. *Demaree,* 80 Ind. 519 ; *City of Madison* v. *Smith,* 83 Ind. 502; *Jelley* v. *Roberts,* 50 Ind. 1 ; *Burnet* v. *Trustees, etc.,* 50 Ind. 251 ; *Mitchell* v. *Wiles,* 59 Ind. 364 ; *City of Fort Wayne* v. *Cody,* 43 Ind. 197 ; *Brinkmeyer* v. *City of Evansville,* 29 Ind. 187 ; *Mayor, etc.,* v. *Roberts,* 34 Ind. 471.

Mandate will lie to compel an officer to act, but not to control the manner of his acting, except to discharge a duty specifically enjoined by law. See cases above cited, and also

*State, ex rel.,* v. *Demaree, supra ; City of Indianapolis* v. *Patterson,* 33 Ind. 157.

This is the rule as applied to school officers, equally with other public officers. *State, ex rel.,* v. *Webber, supra ; Fertich* v. *Michener, supra ; Braden* v. *McNutt,* 114 Ind. 214.

If the discretion of the school board can be controlled in the matter of this particular study, it can be as to all of the prescribed studies, and there is necessarily subordination of the power of the school board in grading to the will of each individual parent who has a child in attendance in the school. This practically destroys it.

The difference between the views entertained by the majority of the court and my opinion, briefly stated, is this: As they construe the law, a petition and demand will only require the admission of the study of the German language to the particular building in which the petitioner's children are at the time instructed, and to no other part of the school, and the board of school commissioners are powerless to say when that shall be; while, as I construe the law, when the petition is presented, and the demand is properly made, that language must be placed in the course with the other required studies, for the equal benefit of all, and that the school officers have the same power to assign it its place in the course that they have over any other study.

For the foregoing reasons I can not concur in the opinion of the majority of the court.

OLDS, J., concurs in this opinion.

Filed June 23, 1891.